Dennis LONG, James Maher, Gary Theunick, and Robert Davey, Plaintiffs–Appellants,

v.

CITY OF SAGINAW, a Municipal Corporation; Teamsters Local 129; and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants–Appellees.

No. 89–1022.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1989.

Decided Aug. 14, 1990.

Michael J. Forster, argued, Saginaw, Mich., for plaintiffs-appellants.

John H. Lindquist, Timothy G. Dugan, Steven B. Rynecki, argued, Milwaukee, Wis., Otto W. Brandt, Jr., Bay City, Mich., Kenneth M. Gonko, argued, Monoghan, Campbell, LoPrete, McDonald & Sogge, Bloomfield Hills, Mich., for defendants-appellees.

Before MERRITT, Chief Judge, KRUPANSKY, Circuit Judge, and SIMPSON, District Judge.*

KRUPANSKY, Circuit Judge.

Plaintiffs-appellants Dennis Long, James Maher, Gary Theunick, and Robert Davey (appellants), former officers of the City of Saginaw, Michigan Police Department, have appealed from a summary judgment entered by the United States District Court for the Eastern District of Michigan for defendants-appellees City of Saginaw (the city), Michigan Law Enforcement Union, Teamsters Local 129, and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the last two appellees collectively "the union"), dismissing appellants' action challenging the city's December 13, 1982 furlough-recall amendment to its 1978 affirmative action plan, which amendment allegedly unilaterally deprived the nonminority appellants of their vested recall and seniority rights without due process or equal protection of the law in violation of the fourteenth amendment to the Constitution. 702 F.Supp. 1313.

The evolution of these proceedings discloses that in April of 1974 the City of Saginaw, Michigan directed its Human Relations Commission to formulate an affirmative action program for the city.

Appellants were duly appointed to the police department in July of 1974 after having qualified as a result of successfully completing a series of written, psychological, and physical tests and a required pro-

* The Honorable Charles R. Simpson, III, United States District Judge for the Western District of Kentucky, sitting by designation.

bationary period of service. Contemporaneously with entering upon their duties, appellants became members of the union where they retained their membership during the time here in controversy.

During the period of concern in issue, Act 78, 1935 Public Act 78, Mich.Comp. Laws § 38.501, *et seq.*, mandated that new hires of reinstatements of all public employees were to be based upon relative merit and fitness as reflected by experience and satisfactory performance during a probationary period of employment without consideration of race, creed, or national origin.

On October 28, 1974, acting upon the report of the Human Relations Commission that minorities were "underutilized" in city government, including the police department, the city enacted an affirmative action plan. The plan created the position of affirmative action officer and, among other provisions, directed an 80% minority hiring goal in the police department to be accomplished by newly implemented employment policies. In 1978, the city reenacted its affirmative action program which redefined minority employment goals for minorities in various city departments. The minority employment objectives for the police department were not disturbed ostensibly because the police department was not "currently hiring." However, despite its announced economic and budgetary limitations, in 1979, the police department initiated a recruitment program targeting minority and female police officer candidates which effort produced an "inadequate" number of minority applicants. This plan continued in force until the December 13, 1982 agreement between the city and the union which is the gravamen of the instant litigation.

On July 1, 1980, the appellees City of Saginaw and the Michigan Law Enforcement Union, Local 129 entered into a three-year collective bargaining agreement to expire July 1, 1983 that incorporated Articles I, VIII, and XII which were virtually the same as those articles appeared in the 1975 and 1977 collective bargaining agreements between the parties. Articles I, VIII, and XII specifically addressed nondiscrimination, layoff, recall, seniority, and retirement and provided the following:

## ARTICLE I

*Section 3. Non–Discrimination.* No person employed in the City police bargaining unit covered by this Agreement shall be discriminated against because of race, religion, sex, creed, color or national origin. The Employer and the Union ascribe to non-discriminatory practices and will encourage applicants for City employment from all racial, religious and nationality groups. The City shall take steps to assure that employment assignments and promotions are given on an equal non-discriminatory basis. Membership in the Union shall be open to every employee covered by this Agreement on a non-discriminatory basis.

## ARTICLE VIII

*Section 1.* In the event Act 78 is no longer applicable to the bargaining unit, layoffs and recalls shall be made in accordance with the provisions contained herein.

*Section 2.* In the event of layoffs, employees will be laid off according to departmental seniority with the least senior employee being laid off first.

*Section 3.* Probationary employees will be laid off first.

*Section 4.* Employees on layoff shall have rights to recall, such employees will be called back in inverse order of layoff, notice of recall shall be sent to the employee's last known address by registered or certified mail....

## ARTICLE XII

### SENIORITY

Seniority of a new officer shall be commenced after the officer has completed his probation period and shall be retroactive from date of his employment. Reemployment shall be covered by Civil Services rules.

\* \* \* \* \* \*

A. Seniority shall not be affected by the race, color, creed, age, sex, marital status, or dependents of the employee....

In 1975, confronted by an economic crisis, the city had placed a moratorium on police department employment and no new employees were hired thereafter. On June 10, 1980, the police department furloughed seventeen police officers including the appellants herein. At the time of the furloughs and thereafter, appellants' seniority and recall rights were vested and protected by Act 78, 1935 Public Act 78, Mich.Comp. Laws § 38.501 *et seq.* and Articles I, VII, and XII of the collective bargaining agreement between the City and the Union under the terms of which the police department would have been required to offer recall to all of the furloughed officers in order of their seniority before recruiting and employing additional police officers.

In 1981, the Michigan Supreme Court, in *Local 1383, International Association of Firefighters v. City of Warren*, 411 Mich. 642, 311 N.W.2d 702 (1981), decided that the provisions of Act 78 could be modified by a collective bargaining agreement between a political subdivision of government and a union. Shortly after that decision, it appears that, despite the economic crises confronting it, the city undertook action to change its obligation to recall furloughed police officers according to seniority by initiating negotiations with Local 129 to amend the existing collective bargaining agreement which would not expire until July 1, 1983. On December 13, 1982, Local 129 entered into an agreement with the city that permitted the police department to employ one minority applicant from an affirmative action list for every recalled furloughed officer.[1] The appellants initially filed this action against the defendants in the state court alleging infringement of the fourteenth amendment, 42 U.S.C. §§ 1981,

1983, 1985, 1986 and various state laws, as well as unfair representation and denial of union voting rights. The case was removed to federal court where the parties filed cross motions for summary judgment.

Relying upon this circuit's decision in *Wygant v. Jackson Board of Education*, 746 F.2d 1152 (6th Cir.1984), the district court denied appellants' motion for summary judgment and granted the appellees' motion concluding that the city's affirmative action plan did not violate the United States Constitution. The court also decided that charges of unfair representation and violations of the collective bargaining agreement's ratification voting requirements were not well taken. Exercising his discretion, the trial judge also dismissed all pendent state claims without prejudice. During the pendency of the initial appeal of this case to this court, the Supreme Court reversed this circuit's decision in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), whereupon the case was "remanded to the district court for reconsideration in light of the Supreme Court's ruling in *Wygant....*" *Long v. Saginaw*, 805 F.2d 1035 (6th Cir.1986) (order remanding to district court). The district court, upon remand, reaffirmed its original disposition and the appellants timely appealed.

In *Wygant*, the Supreme Court defined the criteria against which the constitutionality of affirmative action plans must be judged:

First, any racial classification "must be justified by a compelling governmental interest." Second, the means chosen by the State must be "narrowly tailored to the achievement of that goal."

*Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847 (citations omitted) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) and *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct.

---

1. The appellants charged that the union bargained away their vested furlough recall and seniority right for a promise from the city not to oppose a proposed wage increase for existing active duty police personnel and that the *seventeen* furloughed officers were illegally barred from voting on the sweetheart agreement. The

record discloses that the December 13, 1982 agreement abrogating the vested recall and seniority rights of the appellants carried by a vote of 56 to 40, a margin of *sixteen votes*. The city and the union denied the assertions and the facts remain in conflict as to this issue.

2758, 2776, 65 L.Ed.2d 902 (1980)). Elaborating upon its pronounced fundamental predicate, the Court concluded that societal discrimination alone was insufficient to justify a racial classification and insisted as a condition precedent to the adoption of any affirmative action plan a showing of prior discrimination by the governmental unit involved, which, in this case, would be prior discrimination in the employment practices of the Saginaw Police Department. Accordingly, if the city in the instant case had not engaged in past discriminatory hiring practices within the Saginaw Police Department prior to 1974 and thereafter, then it could not have asserted *in praesenti* that it had a compelling interest to enact any affirmative action program, particularly the furlough-recall modification of its 1978 affirmative action enactment.

> This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted *upon some showing of prior discrimination by the governmental unit involved* before allowing limited use of racial classifications in order to remedy such discrimination.

*Id.* (emphasis added).

Thus, the Court mandated that

> a public employer ... must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, *it must have sufficient evidence to justify the conclusion that there has been prior discrimination.*

*Id.* at 277, 106 S.Ct. at 1848–49 (emphasis added). The lack of evidentiary support for the conclusion that remedial action was warranted became significant when the furlough-recall amendment to the Police Department's 1978 affirmative action plan was challenged in court by nonminority employees. In the instant case, appellants have charged that the corrective program incorporated into the employment furlough-recall provisions approved on December 13, 1982 had the purpose and effect of instituting a racial classification that was unjustified.

The burden of proof placed upon the public employer to justify the enactment of an affirmative action remedial program, as enunciated by the Supreme Court in an analogous case, is a heavy one:

> [W]e can only conclude that the classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subject to strict judicial scrutiny.

*Frontiero v. Richardson,* 411 U.S. 677, 688, 93 S.Ct. 1764, 1771, 36 L.Ed.2d 583 (1973) (plurality opinion). The strict scrutiny standard was adopted by a majority of the Court in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 729, 102 L.Ed.2d 854 (1989) as the standard by which "affirmative action" cases are to be reviewed.

In considering the presence or absence of a compelling governmental interest necessary for justifying affirmative action remedial programs incorporating racial classifications, the teachings of *Wygant* are directory:

> [I]n such a case, the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary.... But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination.

*Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849. As early as 1982, the Supreme Court, in *Palmore,* determined that "to pass constitutional muster, [racial classifications] must be *'necessary* ... to the accomplishment' of their legitimate purposes." *Palmore,* 466 U.S. at 432, 104 S.Ct. at 1882 (emphasis added) (quoting *McLaughlin v. Florida,* 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964)).

■ The Court, in *Wygant,* elaborated and observed that although initial employment opportunities coupled with hiring goals may burden some innocent individuals, they do not impose the same type of

intrusive injuries that layoffs, which result in loss of job expectancy, security, and seniority, involve.

Many of our cases involve union seniority plans with employees who are typically heavily dependent on wages for their day-to-day living. Even a temporary layoff may have adverse financial as well as psychological effects. A worker may invest many productive years in one job and one city with the expectation of earning the stability and security of seniority. "At that point, the rights and expectations surrounding seniority make up what is probably the most valuable capital asset that the worker 'owns,' worth more than the current equity in his home." Fallon & Weiler, Conflicting Models of Racial Justice, 1984 S.Ct.Rev. 1, 58. Layoffs disrupt these settled expectations in a way that general hiring goals do not.

While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive.

*Wygant,* 476 U.S. at 283, 106 S.Ct. at 1851–52. It is apparent from the facts of the instant case that other, less intrusive means of accomplishing the city's purpose—such as achieving the hiring goals mandated by its 1974 and 1978 affirmative action program—were available.[2]

Mindful of the Supreme Court's admonitions in *Wygant* and its progeny that a public employer like the Saginaw Police Department must ensure, before it embarks upon an affirmative action program, that it has convincing proof of prior discrimination, the appellee City of Saginaw Police Department nevertheless has reluctantly conceded that during the entire period spanned by this controversy—the period between approximately 1967 to date—no recorded complaint had been lodged with, nor had an adjudication been issued by, any local, state, or federal administrative agency, nor state or federal court, charging the City of Saginaw Police Department with overt discrimination in the hiring of police officers. The deposition testimony of Mark Kennedy (Kennedy), Director of Administrative Services for the City of Saginaw, Michigan, contradicts the city's attempted justification for the 1982 furlough-recall amendment to the 1978 plan.

Q. Do you know of any attempts by the city or its employees to discriminate against minorities in the scoring of any of the tests required for applicants to complete?

A. I don't know of any such thing.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Are you familiar with this historical backdrop by your being a city resident for all those years or having been participating in the discussions that evolved over the years while you were personnel

---

2. The deposition of Mark Kennedy, Director of Administrative Services, reveals the following enlightening information:

Q. If I understand you correctly, then, the reason the city police force didn't experience the increase in minority hiring is because you were stopped from doing so by reason of Michigan law, being Act 78, and by the fact that you were not hiring at all [in the Police Department] from 1975 forward?
A. That's correct.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Well, any time that you did recruit, you were able to get candidates between 1975 and the layoffs in 1980?
A. Oh, we were able to get candidates all right.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Is it not true that aside from the police department the city has—was able to achieve

an increase in its, what they refer to, as minority representation on its work force from 10 to 15 percent during the years 1974 to 1978?
A. That's what—
Q. That was in the report, right?
A. Right.
Q. Do you have any reason to disbelieve the accuracy of that statement?
A. No.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. You indicated in your affidavit that the city's attempt to improve the racial balance on the police force was thwarted because of severe economic conditions or considerations?
A. That's correct.

director and director of administrative services?

A. By both discussions and looking at some of the old documents that went on—that were created from that.

Q. In that regard, I would like to ask you this. Let's get away from the feelings of the community for just a moment. Have there been any findings, that the city itself was purposely discriminating in its hiring practices?

A. Other than that Woods decision in federal court, which to my understanding was such a finding, I don't know of any other specific findings like that, you know, which answers the question you just asked.

Q. All right. Now, with respect to this Woods decision, that involved the fire department, did it not?

A. That's correct.

Q. It had nothing to do with the police department?

A. To the best of my knowledge, yeah.

Q. The Woods decisions or whatever, was also a decision or judgment that was a consent decree?

A. That's correct.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. In regard to these various others, outside of the Woods decision then, do you know of any administrative agency, federal agency or state agency that said, the City of Saginaw, we find you having discriminated in the hiring of your police officers?

A. I don't know of any state or federal agency that said we discriminated. Do you mean in the hiring of police officers?

Q. Right.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Do you know of any finding by any court, administrative agency, or special committee assigned by the city to study the problem whether or not the city has been found to have failed to act in compliance with Public Act 78 in the hiring of uniformed officers to the city police department?

A. I don't know of any such thing.

In a transcript of a hearing before the State of Michigan Circuit Court for the County of Saginaw, conducted on August 15, 1983, Michael Gunther, the Personnel Administrator for the City of Saginaw, confirmed Kennedy's concessions:

Q. During your employment, were there any findings made by the City Council or by a court or by an administrative body to the effect that the City's hiring practices were discriminatory?

A. No.

Q. When you came to be employed by the City of Saginaw did you receive information to the effect that there had been such findings made by an administrative body, a court, or by a competent governing body of the City, that indeed there had been a finding of past discriminatory practices, hiring practices for the Saginaw Police Department?

A. No.

Standing alone, the City's admissions against interest, absent additional convincing proof of prior discriminatory employment practices within its Police Department, are insufficient to justify the December 13, 1982 furlough-recall amendment which is in controversy in this appellate review.[3]

A review of the record for factual support relied upon by the appellees to justify the 1983 furlough-recall affirmative action program reflects a statistical effort which, if valid, could afford the required probative evidence of discrimination in the employment policies of the City's police department. In deriving statistical data, this court should be ever mindful that there could have been and generally were numerous explanations for disparities between the percentage of minority and nonminority

---

**3.** The only material, relevant, and admissible evidence appears in the depositions and the Saginaw Court transcripts, the substance of which contradicts the conclusory declarations incorporated into the affidavits of Mark Kennedy and Police Chief Alexander Perez.

*Mindful of the summary judgment disposition by the district court, the mass of conflicting charges, and the conflicts of material facts would, at the very least, mandate a remand of this case for trial before the district court.*

police officers on the Saginaw police force, many of them unrelated to discrimination of any kind.

■ The statistical evidence offered is insufficient to justify the plan. In *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Supreme Court restated the yardstick by which to evaluate the sufficiency of statistical presentations which form the basis for charged racial disparity discrimination:

> This Court's recent consideration in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 [(1977)] of the role of statistics in pattern-or-practice suits under Title VII provides substantial guidance in evaluating the arguments advanced by the petitioners. In that case we stated that it is the Government's burden to "establish by a preponderance of the evidence that racial discrimination was the [employer's] standard operating procedure—the regular rather than the unusual practice." *Id.*, at 336, 97 S.Ct., at 1855. We also noted that statistics can be an important source of proof in employment discrimination cases, since
>
> "absent explanation, *it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.* Evidence of long-lasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population." *Id.*, at 340 n. 20, 97 S.Ct., at 1856 n. 20.

*Hazelwood School Dist.*, 433 U.S. at 307–08, 97 S.Ct. at 2741 (emphasis added).[4]

Thus, the relevant proof of discrimination by statistical disparity focuses on those disparities that demonstrate prior governmental discrimination. In the in-

stant case, the city has failed to meet the requirements of *Hazelwood*. It has advanced an undifferentiated work force statistic to support a prima facie case of employment discrimination. The city's view that the relevant comparison is between the total number of minorities employed in the police department and the total number of persons employed in an unidentified "relevant statistical pool" characterized as "protective services" in 1980 in Saginaw County is erroneous.

From this amorphous "relevant statistical work force," the city has argued "that the 1980 civilian labor force for Saginaw County revealed that minority availability in protective service was 29% as compared to a 7.7% minority representation in the Saginaw Police Department." The propriety of the derivation was vigorously disputed because the disparities were incapable of validation absent a disclosure of the composition of the "relevant statistical work force" identified only as "protective services."

Appellees not only failed to define the available "relevant statistical pool," or its composition, they also failed to disclose the constant age, educational background, general physical fitness, and capabilities of its members and other material factors which would have afforded a basis from which meaningful statistical comparisons and inferences could have been fixed thereby disregarding the principles voiced by the Supreme Court in *Hazelwood*.

Although the record fails to incorporate any statistical source material, the city has implied that "the 1980 United States Census Data for the City of Saginaw" was the basis for its 29% available "relevant statistical work force" computation. The judicially noticed U.S. Department of Commerce, Bureau of the Census, 1980 Census of Population: General Social and Economic Characteristics: Michigan Table 177 and Table 185 (hereinafter Saginaw County Census Data), an official publication of the United States Department of Commerce, refutes the appellees' statistical representa-

---

4. See note 2.

tions "that the 1980 civilian labor force for Saginaw County revealed that minority availability in the protective services was 29%." No valid mathematical calculation of any combination of the figures available from the Saginaw County Census Data publications will yield the offered 29% derivation.

In formulating their statistical comparison, the appellees also overlooked a recent substantial population shift of 20,708 residents from the city which resulted in a significant reduction of its population from 98,214 in 1970 to 77,508 in 1980. This exodus increased the ratio of minority population within the city to total population by 12.6% from 32% in 1970 to 44.6% in 1980; the city further failed to consider the high noncoercive turnover (voluntary terminations, retirements, illnesses, etc.) rate among minorities (27.5% of the total turnover rate within the Police Department) as compared to the lesser rate among nonminorities that would, within the context of this case, obviously result in significant statistical distortions in the derivation of appellees' adopted and relied upon 29% calculation.

The final problem with the statistical computation of the available "relevant statistical work force" arises from the job titles listed as "Protective Services" published in the Standard Occupational Classification Manual: 1980, issued by the United States Office of Federal Statistical Policy and Standards, Department of Commerce. In addition to the traditionally recognized law enforcement personnel, i.e., police, FBI, DEA categories, etc., the "Protective Services" classification embraced such unrelated job titles as bouncers, camp guards, school-crossing guards, meter maids, railroad crossing guards, flaggers, school bus monitors, custodial-service workers, life guards, dog catchers, wildlife control agents, dog license officers, animal cruelty

investigators, jailers, turnkeys, immigration guards, penal officers, bodyguards, gate tenders, merchant patrollers, shopping investigators, alarm investigators, and building security officers.

In sum, it is apparent that the statistical argument is without probative value. The city has failed to define the composition of the "protective services," the keystone for deriving its 29% available "relevant statistical work force," which foreclosed validation of its conclusions. If its statistical source material was the 1980 U.S. Census Report, the mathematical calculations were inaccurate since no combination of numbers taken from its cited published 1980 census reports, however mathematically combined, will verify its represented 29% result; it disregarded distortions of magnitude that resulted from the 12.5% population exodus of 20,708 residents from Saginaw accounting for a 12.6% increase in minority representation of the city escalating it from 32% in 1970 to 44.6% in 1980; and it disregarded the noncoercive turnover rate of minority employees in the police department as compared to the lesser rate among nonminority city employees. Coupled with the Commerce Department's judicially noticed report listing the overly broad composition of "Protective Services" with its 13 subclassifications, the problems with the statistical approach are so great that they are without probative value and cannot be the basis for any judicial disposition.

The appellees' arguments charging defendants with discrimination in hiring based on discriminatory tests were also misconceived and without factual support from the record. Neither the joint appendix nor the record outside the appendix affords *any* proof to confirm this statement. The single isolated written examination disclosed only the listed results:

|  | White Males | Black Males | Hispanic Males |
|---|---|---|---|
| Applications | 73 | 34 | 14 |
| Written Tested | 57 | 26 | 12 |
| Written Passed | 36 | 1 | 5 |

Disparities in "examination performance," as in the instant case, without relevant correlation, may be the result of a myriad of causes unrelated to discriminato-

ry action. As a statistical offering of proof, appellees' efforts failed because, as previously discussed, statistics without correlation are indicative of no meaningful inference or conclusion. *Woods v. City of Saginaw,* No. 75–100083 (E.D.Mich. Jan. 18, 1977) lends no credibility to appellees' testing disparity argument. Initially, the record fails to disclose *any* similarities between the written examinations which were the subject of *Woods* and the written examination which was the predicate for the appellees' statistical conclusions. No comparative analytical evidence, either documentary or oral, appears in the record to support the appellees' conclusory charges of discriminatory testing. Secondly, the *Woods* court did not conclude that prima facie evidence of discrimination corrupted the testing procedures of or the tests administered by the Saginaw fire department; nor, as a result of such finding, did it order implementation of an affirmative action program within the fire department for the simple reason that the disposition, including the injunction, resulted from a *consent decree* between the parties, without an adversary trial, the production of evidence, or testimony or proof necessary to satisfy the burden placed upon the respective parties in an adversary legal action.[5]

When the *Woods* lawsuit was filed, there were 145 firefighters employed by the City of Saginaw of whom 2% were minorities. Available statistics disclose that as of September, 1974, there were 170 police officers of whom 11.2% were minorities; in 1980, just after appellants were furloughed, there were 143 police officers of whom 7.7% were minorities; in 1982, *after* the furlough-recall program went into effect, there were 126 police officers of whom 7.1% were minorities. Even in 1982, the police department's percentage ratio of minority/nonminority employment was greater than that of the fire department at the

time of the *Woods* consent judgment, and at a more comparable time, the police department had more than five times the percentage of employed minorities as did the fire department which would belie any valid comparative meaningful relationship between the police department and the fire department when the *Woods* case was initiated.

In sum, the appellees' statistical evidence fails to satisfy accepted principles of statistical analysis.

The "several lawsuits" relied upon by the appellees to distinguish between the instant case and *Wygant* also fail to prove past discrimination inherent in the hiring practices of the city's police department. *Zissler v. City of Saginaw,* No. 72–18164 (Saginaw County Cir.Ct.1975) a 1975 lawsuit, involved a "female, employed by the city police department as an investigator." The only information available from the record identified the action as one seeking equal compensation for comparable work. It did not involve discriminatory hiring practices.

In April, 1976, an individual of Hispanic origin was shot and killed "outside the Wonder Bar in the City of Saginaw." His administrator initiated a civil suit alleging violation of his civil rights and the fourth amendment violations of excessive force. No case is referenced to identify the action. This court is unable to base a finding of discrimination on such evidence.

On April 23, 1981, a black man was shot and killed during the execution of a search warrant by white police officers. The incident subsequently became the subject of a civil action against the city which was pending at the time of appellees' brief. There was no indication in the record that discrimination was the basis for the suit.

---

5. Black's Law Dictionary, Revised Fourth Edition defines a consent judgment as:

Consent Judgment. A judgment, the provisions and terms of which are settled and agreed to by the parties to the action.

It is not the judgment of the court, it is the agreement of the parties entered upon the record with the sanction and approval of the court, and is their act rather than that of the court.

Consent judgments are, in effect, merely contracts acknowledged in open court and ordered to be recorded, but as such they bind the parties as fully as do other judgments.

No additional formal litigation beyond the above factually distinguishable unrelated cases is disclosed by the record.

In 1978, the Black Police Officers Association filed a complaint with the Michigan Department of Civil Rights alleging discrimination, not in hiring practices or assignments within the department, but rather assignments of officers to off-duty functions. Neither the parties nor the substance of the complaint are set out in the record; consequently, the source of the assignments—*i.e.,* police department, the union, etc.—is not disclosed. Appellees' brief asserts that the case was settled. No effort is made to show the relationship between this case and discriminatory hiring practices.

The remaining incidents asserted in the defendants' pleadings, including the expressions of concerns voiced by unidentified community leaders as a result of confrontations between minorities and nonminorities as a consequence of "underutilized minorities," are the classical sociological factors identified by the Supreme Court when it concluded, as it did, that "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848. The Supreme Court has concisely stated:

> This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination.

*Id.* at 274, 106 S.Ct. at 1847. *See also Croson* and *Michigan Road Builders Ass'n v. Milliken,* 834 F.2d 583 (6th Cir. 1987), *aff'd mem., Milliken v. Michigan Road Builders Ass'n,* — U.S. —, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989).

The record of proceedings in the instant case also fails to disclose any definable criteria which support the appellees' conclusion that the city's remedial plan was narrowly tailored within the mandates of *Wygant, Croson,* and *Michigan Road Builders Association.*

A review of the record reflects that the hiring goal that the 1983 furlough-recall plan was designed to safeguard was tied to the percentage of minority police officers in what had been defined as "protective services" and not to the percentage of qualified minority police officers within a more realistic relevant labor pool of traditionally recognized law enforcement personnel. Thus, the disparity between the percentage of minorities within the police department and the percentage of minorities within the "protective services" was obviously not probative of employment discrimination; it is only when the statistics disclose that the availability of minorities in the relevant labor pool substantially exceeded those hired that an inference of deliberate discrimination in employment may be drawn. Because the recall plan here in issue acts to increase levels of minority hiring that have no relation to remedying employment discrimination, it cannot be adjudged "narrowly tailored" to effectuate its asserted remedial purpose. As a result of this reasoning, Justice O'Connor concluded in her concurring opinion in *Wygant* that:

> Because the layoff provision [recall plan] here acts to maintain [increase] levels of minority hiring, that have no relation to remedying employment discrimination, it cannot be adjudged "narrowly tailored" to effectuate its asserted remedial purpose.

*Wygant, supra,* 476 U.S. at 294, 106 S.Ct. at 1857 (O'Connor, J., concurring).

Accordingly, the appellees have developed a factual record that fails to support the conclusion that the plan here in controversy was "narrowly tailored" within the parameters of *Wygant, Croson,* and *Michigan Road Builders Association.*

The record before this court is insufficient to justify the entry of summary judgment for appellees. This case is REMANDED for trial or such other further proceedings as are not inconsistent with this opinion.

■ Appellants' claims against appellee union pursuant to 29 U.S.C. § 411(a)(1)

must be dismissed, since 29 U.S.C. § 402(e) specifically provides that any state or political subdivision thereof is excluded from the definition of "employer" as that term is used in section 411. Title 29 U.S.C. §§ 142, 152 also exclude states or political subdivisions from the definition of "employer" as that term is used in the Labor Management Relations Act (LMRA). 29 U.S.C. § 141 *et seq.*, including LMRA § 301, 29 U.S.C. § 185. Therefore the "section 301" action must be dismissed. *See Moir v. Greater Cleveland Regional Transit Authority*, 895 F.2d 266, 269 (6th Cir.1990). However, Local 129 may nevertheless be subject to an order of injunction mandating the enforcement of the terms and conditions of the collective bargaining agreement in effect prior to its action relinquishing the appellants' vested seniority and recall rights by approving the December 13, 1982 furlough-recall agreement with the city.

Finally, the validity of the remaining pendent state claims, which include state law remedies for the union's alleged denial of appellant's rights to vote and unfair representation, if any, resulting from Local 129's agreement to the furlough-recall agreement should be resolved by the district court upon remand.

For the above-stated reasons, the district court's judgment is REVERSED and RE-MANDED insofar as the appellants' fourteenth amendment cause of action is concerned, the district court's judgment resolving appellants' causes of action pursuant to section 301 of the LMRA and 29 U.S.C. § 411(a)(1) is VACATED and REMANDED with instructions that those causes of action be DISMISSED, and any remaining pendent state law causes of action are to be resolved by the district court, within its discretion, on remand.