Charles **MIDDLETON, W. Osmund Kelly, III, Brian Sepanak, Bruce Sepanak, Stephen Hill, Gregory Doerr, Barry Saunders, Robert Lorey, Maynard Newman, James McClellan, Mark Campbell, and Thomas Hilgendorf, Plaintiffs,**

v.

**The CITY OF FLINT, a municipal corporation, and The Flint Police Officers Association, Defendants.**

Civ. A. No. 90–CV–40148–FL.

United States District Court,
E.D. Michigan, S.D.,
at Flint.

Jan. 7, 1993.

Gregory T. Gibbs, Flint, MI, Michael J. Kelly, Edwin W. Jakeway, Grand Blanc, MI, for plaintiffs.

Terrence J. Miglio, Donna R. Nuyen, Christopher M. Murray, Detroit, MI, Bernard Feldman, Troy, MI, for defendants.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

*Facts and Procedural History*

This is a fourteenth amendment challenge to the City of Flint's affirmative action plan ("Plan") for promoting police officers to sergeant. The Plan established hiring requirements that may fairly be characterized as a 1:1 hiring quota. When the Flint Police Department requires additional police sergeants, it hires alternately a minority applicant and a caucasian applicant from the list of eligible applicants. Eligibility is determined by a test score, weighted for seniority of the applicant. *See* Defendants' Brief, Exhibit 4, in Support of Motion for Summary Judgment (1992). As a result of the quota, the eleven plaintiffs, who are white, male police officers, were passed over for promotion to sergeant at least once and five plaintiffs were passed over twice. *See* Plaintiffs' Brief in Opposition to First Motion For Summary Disposition 2–3 (1991), and supporting affidavits.

The City established the Plan following hearings before the Flint Human Relations Commission ("HRC") in 1984.[1] The Commission took testimony from several witnesses regarding discrimination on the police force and considered prior judicial findings of discrimination on the police force and a statistical analysis of the police hiring and promotion record.

In August, 1984, the Commission issued its report making findings of past discrimination on the police force and recommended the implementation of the affirmative action plan.

The findings were supported by uncontroverted statistical evidence of under-representation of minorities in the Department. The Commission was provided with a labor force analysis of the Police Department prepared by a labor market economist. This report concluded that the Police Department had discriminated against minority applicants[2] both at the entry level and for promotion to sergeant. The former conclusion was based upon a comparison of the percentage of the minority qualified labor pool with the percentage of minority police officers. The latter conclusion was based upon a comparison of the percentage of minorities at the police sergeant level with the percentage of minorities that there would have been on the police force absent any discrimination in the hiring or promotion of entry level police officers.

In addition to this statistical evidence, the Commission took anecdotal testimony about discrimination on the police force from a variety of sources, including police officials and political figures, such as the

---

1. The Commission's hearings followed a series of special meetings by the Flint City Council concerning representation of minorities at the level of sergeant.

2. According to the 1980 census, 93 percent of all Flint minority residents were African–Americans. Defendant's Brief, Exhibit 6 at 4.

Flint City Council President, Melvin McCree. Mr. McCree testified that the City Council had investigated the Police Department in 1981 and 1983 resulting in a finding that there was "a dramatic under-representation of minority persons in all ranks of the police department ..." *Defendant's Brief in Support of Motion for Summary Judgment* (1992), Exhibit 5.

Police Chief Miles White testified and presented documentation that the police department had engaged in unlawful discrimination against minority persons in its hiring, *promotion* and assignment policies and practices. Flint Police Sergeant Evans and Flint Police Officer Dorris Roberts, President of the Afro–American Police League of Flint, testified about historical and *current* employment discrimination against minority persons in the police department in hiring, *promotions*, training and assignments. *See* Defendants' Brief, Exhibit 5, at A132. (findings of fact by the HRC).

Several relevant HRC findings are reprinted:

25. Fourteen persons were promoted off the current eligible list for police sergeants. All fourteen were white including one white female.

26. The current eligible list for police sergeant expires March 23, 1985. Without affirmative action initiatives the next twenty-one persons to be promoted to police sergeant from the current eligible list will be white.

\* \* \* \* \* \*

30. Having examined the submission of the chief of police, along with all of the other evidence presented, the Commission finds that the statistical and anecdotal evidence of discrimination against minorities which was presented established a broad pattern of prior discrimination.

31. The Commission concludes that the currently appropriate labor market

for police officer in the Flint police department is approximately 45% minority.

\* \* \* \* \* \*

34. The Commission finds that reform of the police department's selection procedures is inadequate to remedy the present effects of prior discrimination and to provide for the operational needs of the department.

\* \* \* \* \* \*

38. The Commission finds that implementation of a 1–to–1 promotional ratio until parity is achieved will not unnecessarily trammel the interests of non-minority officers.

39. The Commission finds that the objective of remedying the effects of past and present discrimination against minority persons in a timely fashion requires adoption of implementation ratios which serve to accelerate the effectuation of that remedy.

*Id.,* at A134–35.

The Commission also considered that the hiring and promotional practices of the City have been subject to judicial scrutiny since the early 1970's. The City of Flint's minority population increased from approximately seventeen percent in 1960 to twenty-eight percent in 1970 and thirty-four percent in 1974. *Alfaro v. Suber,* Civil Action No. 613, May 18, 1977 (E.D.Mich.) (unpublished op.). The HRC also cited several other court opinions as prior judicial findings of discrimination.[3]

On July 19, 1985, the Mayor presented to the Michigan Civil Rights Commission an affirmative action plan based upon the HRC's hearings that covered the entire city's workforce. The Commission approved the plan on January 27, 1986. In the meantime, the collective bargaining agreement between the City and the Flint Police Officers Patrolmen's Association was amended to accommodate the City's new plan. *See* Defendant's Brief, Exhibits 2–4.

---

**3.** Many of these cases concerned discrimination that is not at issue in this lawsuit, e.g., on the

Flint Fire Department.

The City's expert, Dr. Bendick, has provided a new study that buttresses the City's findings from 1984. The study takes the number of actual African–Americans on the police force as of January 1992 and adjusts it upward to reflect what the number would have been absent discrimination. He arrives at the adjusted percentage of 41.5 percent. That is absent past discrimination, the Flint Police Department would currently be composed of 41.5 percent minority police officers.[4] Therefore, Defendants contend the percentage of minorities among Flint Police Department police sergeants should also be 41.5 percent.[5] As of January 1, 1992, the Police Department was 4.4 minority sergeants, or 5.6 percent short, of meeting the Plan's goal.

Plaintiffs contend that there is no proof of any past discrimination in the hiring of police sergeants, but only of entry level police officers. Plaintiffs' expert has determined that the correct comparison group is simply the number of minority police officers currently on the force, which is approximately 30 percent. As of January 1, 1992 the percentage of sergeants that were minority was 36 percent. In fact, plaintiffs claim that black sergeants are over-represented on the police force relative to the number of black policemen. Plaintiff's Brief at 14, Exhibit 6; testimony of Dr. Frank at 32–47, 55, 63–64.

According to plaintiffs, the City has simply misread the prior judicial decisions. These cases do not find discrimination at the promotional level, but only at the entry level. Moreover, the findings of entry level discrimination were quickly eradicated:

It is clear from a review of the cases above that while there were judicial decisions finding that there was discrimination in the hiring at entry level positions, that those decisions also found that this discrimination was being eradicated as early as 1973 and that the implementation of a quota at the hiring level was inappropriate. Moreover these decisions make it clear that there was absolutely no judicial determination that the City of Flint had engaged in racial discrimination in promotion to the position of sergeant before the City of Flint decided to implement it's [sic] Affirmative Action Program for the position of sergeant in 1984.

Plaintiff's Brief at 6.

Plaintiffs present evidence from depositions that the Mayor of Flint ran on a campaign to institute affirmative action, and therefore, speculate that he was prepared to institute the affirmative action policy regardless of the commission hearings. Thus, Plaintiffs contend, the City's motivation in implementing the Plan was an illegal one. See e.g., Plaintiffs' Brief at 7, citing deposition of James Sharp, Mayor of Flint.

Plaintiffs also contend that because the hearings were not adversarial in nature, i.e., there was no cross-examination, they "were not hearings at all." Plaintiff's Brief at 9.

Plaintiffs also suggest that the City had less restrictive means than a quota available to it when it implemented the affirmative action plan. Plaintiffs' expert suggests that the test could have been validated as nondiscriminatory through an "assessment center."

## LEGAL ANALYSIS

### I. Standard of Review

To obtain summary judgment, Defendant must show there exists no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Bender v. Southland, 749 F.2d 1205, 1210 (6th Cir.1984).

---

4. This figure is substantially less than Flint's minority population, which is 53.2 percent. It takes into account minimum educational requirements required for the police officer position, a high school diploma, and also discounts the numbers to reflect the applicant pool for police officers that comes from the largely white communities that are in the greater Flint area. See Defendant's Brief, Exhibit 7 at 17, 22–23.

5. The City's expert has also suggested that the minority representation on the police force should ideally exceed the 41.5 percent figure. Defendant's Exhibit 7 at 21. However, his basis for this position is not that it would undo prior discrimination but rather that it would provide other benefits, such as advancing the operational needs of the Department.

The evidence and all reasonable inference which may be drawn from the evidence is required to be viewed in a light most favorable to the party opposing summary judgment. *Id.*, at 1210–11.

■ Under *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) and *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), this Court must subject the Flint police sergeant affirmative action program to a strict scrutiny review. *Long v. City of Saginaw*, 911 F.2d 1192 (6th Cir.1989).

■ Under this exacting standard, the City must have had a compelling state interest when it enacted that Plan, and the Plan must be narrowly tailored to further the compelling state interest. Under the stipulated facts, these are questions of law for the Court. *Bratton v. City of Detroit*, 704 F.2d 878, 898–899 (6th Cir.1983), *modified on other grounds*, 712 F.2d 222 (6th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

## II. Did the City have a Compelling State Interest When It Adopted the Plan?

The major issue in the "compelling state interest" prong of strict scrutiny review is whether the City "had a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848; *Vogel v. City of Cincinnati*, 959 F.2d 594, 601 (6th Cir. 1992).

This Court bears in mind that under the dictates of *Croson* it must "smoke out illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." 488 U.S. at 493, 109 S.Ct. at 720.

## A. Procedures of the HRC

■ At the outset, the Court must dismiss Plaintiff's argument that the HRC's lack of adversarial proceedings or failure to adopt court rules invalidates its findings. This Commission performed a legislative and not a judicial function. The Court takes judicial notice of the absence of cross-examination in Congressional hearings. Nor is the Court familiar with any legislative body that adopts court rules. Legislative hearings are inherently more political than court proceedings, but that does not invalidate their findings.

■ Rather, the question is whether the HRC considered the proper type of evidence that could reasonably justify its findings of discrimination. A prior judicial finding of discrimination constitutes the strongest evidence that the Court could consider. However, such a finding is not necessary. Other types of evidence that a legislative body may use are statistical evidence and anecdotal evidence: "Evidence of wide statistical disparity, however, may justify an affirmative action policy adopted by a public employer." *Vogel v. Cincinnati*, 959 F.2d 594, 599 (6th Cir.1992) *quoting Wygant*, 476 U.S. at 274–75, 106 S.Ct. at 1847 (citing *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)). *See also, Croson*, "['w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern of discrimination.' " 488 U.S. at 501, 109 S.Ct. at 725. (*quoting Hazelwood School Dist.*, 433 U.S. at 307–08, 97 S.Ct. at 2741).

## B. The HRC's Reliance on Prior Judicial Findings

■ In 1973, this Court issued a preliminary injunction suspending the use of a written examination and of college credits as a requirement to become a patrol officer. *Holliman v. Price*, 9 Fair Empl.Prac. Cas. (BNA) 1363, 1372 (1973). That order held that the City had failed to comply with the requirements of a federal law [6] requiring the elimination of barriers to hiring

---

**6.** Section 6(a) of the Emergency Employment Act of 1971, 42 U.S.C. §§ 4871 et seq. and regulations codified at 29 C.F.R. § 55.3, 55.6. This law was superseded by the Comprehensive Employment and Training Act of 1973, Pub.L. 93–203, 87 Stat. 839, codified at 29 U.S.C. § 841 et seq.

minorities when it accepted federal funds to hire patrolmen. *Id.* *Holliman* did not address the issue of promotion.

In the 1970s, the Flint Police Department instituted a 1:4 quota system as part of a consent decree in *Flint Police Patrolmen's Association v. City of Flint,* no. 74–33234–CL, December 2, 1974. (E.D.Mich. unpublished op.) This system was only to stay in effect until fifteen percent of sergeants were minority.

Minority police officers challenged the sufficiency of that system in *Alfaro v. Suber,* Civil Action no. 613, May 18, 1977 (E.D.Mich.1977) (Harvey, J.) (unpublished op.). Judge Harvey, while finding discrimination at the entry level in the police force, found that the 1970, 1973 and 1975 sergeants' examination did not result in a sufficient disparity between black and white applicants to hold that the examination was discriminatory. Judge Harvey did not consider, however, the type of statistical analysis for a disparate impact analysis that Defendants put forward in 1984 or in the case at bar, in which discrimination at the entry level is taken into account in determining the need for affirmative action at the promotion level.

The consent order was again challenged, this time by white police officers, in *Waldron v. Flint Police Patrolmen's Association,* no. 75–40084, appended as Exhibit 10 to Defendants' Brief. In an order dated September 28, 1981, Magistrate Harvey D. Walker's Opinion and Recommendation of March 4, 1980 was adopted as the Court opinion. That opinion found for Defendants and against the white police officers. It noted:

> In the case at hand no Plaintiff has been terminated. The Plaintiffs have at the most suffered some delay in expected promotion.

Memorandum Opinion and Recommendation at 7.

The opinion then held the following regarding the 42 U.S.C. § 1983 claim:

> "Therefore, inasmuch as this Court has heretofore made a finding that the Plain-

tiffs have not proven a deprivation of any of their Constitutional rights by the terms of the Consent Judgment, there is no remedy which the Plaintiffs may avail themselves of under this Section of the U.S. Code."

*Id.,* at 10.

The *Waldron* opinion therefore explicitly upheld a quota in the hiring of police sergeants under the Fourteenth Amendment.

These opinions comprise the judicial backdrop of race discrimination at the Flint Police Department that the HRC considered in determining that that there was a history of discrimination on the police force.[7] While the cases demonstrate the existence of racial discrimination in the Police Department, they do not constitute sufficient evidence to indicate the need for a 1:1 quota in the hiring of police sergeants.

The clearest case providing evidence of discrimination at the promotional level is *Waldron,* to which no specific reference was made. While the HRC's findings of prior judicial determinations of discrimination in promotions can reasonably be attributed to a familiarity with *Waldron,* even that case does no more than to uphold the prior quota of 1:4 up to fifteen percent. The HRC must, therefore, have relied upon other findings to "constitute a sufficient basis in evidence" of the need to establish the Plan.

### C. Anecdotal Evidence

■ The anecdotal evidence of discrimination is considerable and worthy of weight. The HRC took testimony from several insiders on the police force as well as from members of the community. Indeed, the chief of police testified to *continuing discrimination on the police force.* Testimony from such a well-placed source that supports the creation of an affirmative action plan with an admission of continuing discrimination is not routinely

---

**7.** *Waldron, supra* is not specifically cited in the HRC's findings.

found in the record in affirmative action cases.[8]

While the anecdotal testimony serves to show a culture on the police force that is discriminatory, it does not, by itself, provide the necessary support for the establishment of a quota in the hiring of police sergeants. Indeed, the testimony of the police chief provided *de facto* evidence that the new leadership of the police department had a sensitive attitude towards minority hiring and promotion.

Thus, for the HRC to have found a "sufficient basis in evidence" to recommend the establishment of a promotion quota, statistical evidence must support that decision.

### D. The Choice of Statistics: Which Comparison Group Matters?

In *Croson*, the Court held that it would only find a compelling state interest for a city's affirmative action program if the city had previously discriminated against the group of people benefitted by the Plan. A result of *Croson* is a continuation of the battle to define the relevant groups for purposes of comparison. This is an issue that continues to bedevil Title VII litigation as well. *See e.g.*, David D. Meyer, Note, *Finding a "Manifest Imbalance": The Case for a Unified Statistical Test for Voluntary Affirmative Action Under Title VII*, 87 Mich.L.Rev. 1986 (1989).

■■■■■ There is, for instance, the general population of minority and non-minority individuals within a given area. After *Croson*, that is never the relevant group for comparison. *Vogel*, 959 F.2d at 600. The parties dispute exactly who is the group with which the percentage of minority police sergeants should be compared. The City claims that the basis for comparison is the number of minorities that would serve on the police force absent discrimination at the entry level or promotional level in the Police Department.

The City's labor market economist has demonstrated that absent past discrimination at both the entry level and at promotion to sergeant, the percentage of minority sergeants would be 41.5 percent.[9] Plaintiff's expert suggests that the City's expert chose an incorrect figure by considering the effect of the discrimination at the entry level as influencing the discrimination at the promotion level. However, the Supreme Court has specifically determined that the City's approach is proper.

In *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), the Court upheld a 1:1 quota for promotions to corporal in an Alabama public safety department. The Court clearly rejected the defendants' argument that the quota could not be applied to promotions:

> [Defendants] argue that no remedial relief is justified in the promotion context because the intentional discrimination in hiring was without effect in the upper ranks, and because the Department's promotional procedure was not discriminatory. There is no merit in either premise.
>
> Discrimination at the entry level necessarily precluded blacks from competing for promotions, and resulted in a departmental hierarchy dominated exclusively by non-minorities.

480 U.S. at 168, 107 S.Ct. at 1065.

When the City commenced the Plan in 1984, the percentage of sergeants that were minority was 10.8 percent; whereas the percentage of sergeants who would have been minority absent past discrimination in 1984 was 31.1 percent. Defendant's Brief in Support of (first) Motion for Summary Judgment, (filed October 11, 1991), Exhibit B, at A119 (Table Three). Since 1984, however, as the percentage of minorities in the applicable labor pool has increased, so has the degree of expected representation of minority sergeants on the

---

**8.** Undoubtedly, one reason is that such comments could be admissible in a civil rights lawsuit against the City by a minority plaintiff.

**9.** Plaintiffs charge that the City's expert and the City relied upon general population statistics in establishing the plan. A review of the HRC

report and the City expert's report from 1984 shows this plainly not to be the case. While general population figures are mentioned, the key discussion looks to the relevant labor market, exactly what the Supreme Court has instructed is appropriate.

police force. That is why, by 1992, Defendant's expert has stated that one would expect the percentage of minority sergeants to be 41.5%.

The discrepancy between the expected number of minority sergeants and the actual number of minority sergeants was, at the time of the adoption of the Plan, considerable: 10.1% v. 31.1%. When combined with the powerful anecdotal accounts of continuing racism in the Department, the statistical evidence provides the "sufficient basis in evidence" for this Court to find a compelling state interest to adopt the plan

■ Plaintiffs' allegations of a predisposed city administration do not undermine the fact finding that the City performed to justify its adoption of the Plan.

## III. Is the plan narrowly tailored?

■ The Supreme Court has identified several factors in determining whether an affirmative action plan is narrowly tailored:
* the necessity of relief;
* efficacy of alternative remedies;
* flexibility and duration of the plan including the availability of a waiver
* relationship of the numerical goals to the relevant labor market;
* impact of the relief on the rights of third parties.

*United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987).

### A. Necessity of Relief

The history of discrimination on the police force, as shown through the statistical and anecdotal evidence, when combined with prior judicial intervention that had been unable to end the lack of representation of minorities on the police force made it plain in 1984 that relief was necessary.

### B. Efficacy of Alternative Remedies.

Plaintiffs argue that alternative selection criteria could have been employed in choosing sergeants. However, they ignore the

fact that several other remedies, including a 1:4 quota system, *see Waldron, supra*, had been previously attempted. In spite of efforts dating back to the early 1970s to increase the number of black police sergeants, the numbers were still quite low. It therefore seems highly unlikely that a mere adoption of an assessment center's evaluation of the selection criteria would result in racial representation at the sergeant's level.

Indeed, in the absence of a quota, underrepresentation would continue until an entire generation of police sergeants retired. This result would occur because no proposed change in selection criteria would yield *greater* numbers of minorities than their proportion in the population. Thus, even assuming a racially unbiased selection criteria were put into place in 1984, so long as the police sergeants who served up until that time remained on the force, minority representation would be low relative to the number of qualified minority applicants. The result would be the continuation of the effects of prior discrimination for many years in the future.

Therefore, it was reasonable for the Plan to adopt a 1:1 quota.

### C. Flexibility and Duration of Plan

There has been no suggestion that the minorities appointed to sergeant are not qualified. *Cf. Paradise*, 480 U.S. at 177–178, 107 S.Ct. at 1069–1070. This plan is not of indefinite duration. The *Paradise* Court also upheld a plan with a long duration. Judge Gadola, in *Detroit Police Officers Ass'n v. Young*, 765 F.Supp. 393, 396 (E.D.Mich.1991) upheld a 1:1 Plan with a sixteen year duration as reasonable. This Plan will probably expire this year or next year, eight to nine years after inception.[10] Moreover, as in *Young*, the Plan has been flexible in allowing the positions to be filled as needed, and not requiring minorities to be hired regardless of the need for sergeants. Therefore, this plan is sufficiently flexible and of reasonable duration.

**10.** That is, the part of the Plan at issue in this case, concerning the promotion to sergeant will

soon meet its stated goal.

## D. Relevant Labor Market

This issue has been adequately addressed in the analysis under the "compelling state interest" prong. The same analysis demonstrates that the Plan is narrowly tailored. The Plan employed the 41.5% figure because it reflects the percentage of qualified minorities that would be on the police force absent discrimination. *Compare Young*, 765 F.Supp. at 397, in which the Court found that fifty percent black police officers and investigators was "sufficiently related" to the Department's end goal of fifty percent in promotions. For the reasons discussed *supra*, the Court finds *Paradise* provides authority for the statistical analysis that removes the effect of prior discrimination to determine the relevant qualified pool.

## E. Impact on Third Parties

The Supreme Court has said that unlike the discharge of workers, the granting of promotions is a less painful way to effect affirmative action. Thus, in the *Paradise* case, the Supreme Court upheld a rigid hiring quota on a police force; whereas, the Court struck down race-based layoffs in *Wygant*, 476 U.S. at 282–83, 106 S.Ct. at 1851 ("Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job."). Thus, the case at bar may be distinguished from *Long v. City of Saginaw*, 911 F.2d 1192 (6th Cir.1990), in which the Sixth Circuit struck down Saginaw's decision to lay off police officers to conform to affirmative action goals.

As to Plaintiffs' argument that less restrictive means were available in this case, considerable evidence remains that this simply was not the case. For instance, regarding the sergeants examination results from 1976–1979, *Plaintiff's* expert has noted, "the proportion of white candidates passing is roughly double the proportion of black candidates passing the exami-

nation." Defendant's Reply Brief, Exhibit A. This troubling result occurred *after* Judge Harvey's *Alfaro* decision finding no bias in the selection process for sergeant.

Plaintiff's suggestion that alternate tests be used has been implemented as part of the plan. Plaintiffs are unable to demonstrate how their proposed changes acting alone would have overcome the rather drastic effects of prior discrimination on minority representation on the force. After a thirteen year history of government efforts to integrate the police force through moderate means, the City acted reasonably to impose the 1:1 quota. This Court is unable to find that any other measures would have eliminated the effects of prior discrimination.

## IV. Continuation of the Plan?

 Does the City have a compelling state interest to continue the Plan once the 41.5 percent goal is attained? [11] The City's expert has suggested that "operational needs" and "operational efficiency and effectiveness" would be enhanced by increasing the percentage of minority representation at the sergeant's level until 53.2 percent of the sergeants are minority. *Defendant's Brief*, exhibit 7 at 20–21. This number reflects the Flint minority population.

 This goal is plainly insupportable under current law. Goals other than remediation of prior discrimination of a particularized group cannot serve as the basis for an affirmative action program by a state entity. *Croson*, 488 U.S. at 493, 109 S.Ct. at 720. The City cannot now amend the Plan to choose the general population as the basis for comparison.

Therefore, the City must cease the operation of the Plan as it relates to the hiring or promotion of police sergeants as of the date that minority representation of police sergeants reaches 41.5 percent.

## V. Conclusion

A. There is no material issue of genuine fact as to whether the Human Rights Com-

---

**11.** This question is ripe for review since the City is on the verge of meeting its goal of 41.5 percent minority police sergeants.

mission found sufficient evidence of prior discrimination to find a compelling state interest in the adoption of the affirmative action plan.

B. The Plan is narrowly tailored.

C. Summary judgment is therefore granted for the City of Flint on all remaining counts.

D. The Plan shall cease to operate in connection with the hiring of sergeants on the date that the percentage of police sergeants that are minority reaches 41.5 percent. On that date, a new promotion or hiring policy shall be placed into effect in which sergeants shall be hired on a color-blind basis. After that date, the City may not institute any race-based hiring of sergeants absent the establishment of a new affirmative action plan in accordance with constitutional requirements.

In addition, all previously imposed limits on the City's ability to establish criteria to hire sergeants, such as education and testing requirements, that were ordered by the federal district court in Flint are hereby revoked as of the date that the Plan no longer applies to the selection of sergeants.

SO ORDERED.